Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Angelica M. Ornelas (State Bar No. 285929)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
*dcg@girardgibbs.com*
*je@girardgibbs.com*
*aep@girardgibbs.com*
*amo@girardgibbs.com*

*Attorneys for Plaintiff City of Fremont*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| THE CITY OF FREMONT on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>FIELDTURF USA, INC., a Florida Corporation, FIELDTURF, INC., a Canadian Corporation, and  FIELDTURF TARKETT SAS, a French Corporation,<br><br>                    Defendants. | Case No. 4:17-cv-5053<br><br>**COMPLAINT FOR:**<br><br>1.  **Unjust Enrichment;**<br>2.  **Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200,** *et seq.***;**<br>3.  **Breach of Express Warranty;**<br>4.  **Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>5.  **Breach of the Implied Warranty of Merchantability; and**<br>6.  **Breach of the Implied Warranty of Fitness for a Particular Purpose.**<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

The City of Fremont ("Fremont" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges as follows:

## SUMMARY OF THE ACTION

1.   FieldTurf sold Fremont artificial turf fields it knew were defective and certain to fail prematurely.  Despite its awareness of the defects, since at least 2005, FieldTurf has continued to manufacture, market, and sell these defective fields to entities across the country.  FieldTurf specifically knew that its fields would not last for the full eight-year warranty period due to structural inadequacies.  Nevertheless, FieldTurf told prospective customers, like Fremont, that the fields would last 10 years or more.

2.   Beginning in 2007, Fremont purchased multiple artificial turf fields from FieldTurf.  Just three years after the first field—the Irvington Ballfield—was installed, Fremont employees noticed substantial wear and abnormal damage to its turf.  FieldTurf representatives assured Fremont that the damage was just ordinary wear and tear.  During that same time, however, FieldTurf had the field tested by an independent consultant who concluded that the turf was defective and unsafe.

3.   Instead of acknowledging that the Irvington field was defective—which it knew to be the case—and offering appropriate warranty relief, FieldTurf advised that normal maintenance would sufficiently preserve the field for long-term use.  Because the city requires a safe and usable field, Fremont paid out a significant sum to replace the Irvington Ballfield.

4.   Fremont also purchased another artificial turf field, the Centerville Ballfield, in 2011.  Like the Irvington Ballfield, the Centerville Ballfield is failing prematurely.

5.   By selling Fremont and similarly situated purchasers artificial turf fields known to fail prematurely, and by failing to provide appropriate warranty relief when the fields failed, FieldTurf breached express and implied warranties, violated the implied covenant of good faith and fair dealing, engaged in unfair and deceptive business practices, and was unjustly enriched.  Fremont and the other FieldTurf customers who incurred economic losses attributable to these violations now seek relief.

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

**INTRADISTRICT ASSIGNMENT**

6.    Assignment to the Oakland Division is proper under Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to Plaintiff's claims occurred in Alameda County.

**PARTIES**

7.    Plaintiff City of Fremont is a city in Alameda County, California.  Fremont purchased defective artificial fields from FieldTurf and has sustained damages as a result.

8.    Defendant FieldTurf USA, Inc. is a Florida corporation with its principal place of business at 75 North Industrial Blvd., N.E., Calhoun, GA 30701.  FieldTurf USA markets, manufactures, sells and installs the relevant artificial turf fields in California and throughout the United States.

9.    Defendant FieldTurf, Inc. is a Canadian corporation with its principal place of business at 8088 Montview Road, Montreal, Quebec, H4P 2L7.  FieldTurf, Inc. manufactures, sells, and installs the relevant artificial turf fields or otherwise conducts business in the United States, including California.

10.    Defendant FieldTurf Tarkett SAS is a French corporation with its principal place of business at 2 Rue de l'Egalite, 92748 Nanterre Cedex, France.  FieldTurf Tarkett is the parent corporation of FieldTurf USA and FieldTurf Inc.

11.    FieldTurf USA Inc., FieldTurf Inc., and FieldTurf Tarkett SAS are referred to collectively herein as "FieldTurf" or "Defendants."

**JURISDICTION AND VENUE**

12.    This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceeds $5 million, exclusive of interest, attorneys' fees, and costs, and (3) Fremont and FieldTurf are domiciled in different states.

13.    The Court has personal jurisdiction over Defendants because they have sufficient minimum contacts in California to render the exercise of jurisdiction by this court proper and necessary.  FieldTurf intentionally avails itself of markets within California through the active

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

promotion, sale (FieldTurf maintains three California sales representatives), marketing, and distribution of its products in this state.  Fremont sustained injury within this forum.

14.     Venue is proper in this District under 28 U.S.C. § 1301(b) because FieldTurf sold artificial turf fields in this District and a substantial part of the conduct at issue in this case occurred in Alameda County.

## PLAINTIFF-SPECIFIC ALLEGATIONS

15.     Fremont purchased the multi-sport Irvington Ballfield turf from FieldTurf in mid-2007. Fremont selected a FieldTurf Series Two monofilament field for installation.  The field was fully installed by March 2008.

16.     Before purchasing the Irvington Ballfield, Fremont city employees encountered FieldTurf advertisements and marketing materials that portrayed its artificial turf fields as durable and specifically represented that the fields would last for at least 10 years.

17.     In 2011, three years after it was installed, Fremont city employees observed excessive wear and deterioration on the Irvington Ballfield.  FieldTurf representatives assured Fremont that the loss of fiber was normal wear and tear, and promised to give the field extra customer attention in the future.

18.     During this same time period, FieldTurf hired an independent consultant to test the Irvington Ballfield, including for impact attenuation.  The consultant's report noted certain areas of the field had significant deterioration, and were unsafe to use under the standards of the synthetic turf council.  Fremont was not given a copy of this report until February 2016, at which point the warranty period had expired.

19.     By 2013, the Irvington Ballfield field was experiencing fibrillated turf (splitting of the fibers), loss of turf, and line markers becoming unglued.

20.     By 2015, the Irvington Ballfield had become unusable and Fremont hired a different company to replace it.  The new field was completed in May 2017, at a substantial cost, borne by Fremont.

21.     Based on FieldTurf's representations that the Irvington Ballfield's wear was normal, and FieldTurf's continued touting of its fields as durable and long lasting, Fremont in 2011 purchased a

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

second artificial monofilament turf field, the Centerville Ballfield, from FieldTurf.  The Centerville Ballfield shows signs of premature failure, including excessive wear and loss of turf.

22.    Both the Irvington and Centerville contracts between Fremont and FieldTurf provide that the fields will be free from defects in materials or workmanship for a period of eight years from installation.

23.    At no point did FieldTurf disclose to Fremont that its artificial turf fields were defective. Before each of its purchases from FieldTurf, Fremont was not aware that the fields were defective and certain to fail before the end of the warranty period.  Fremont would not have purchased FieldTurf fields had it known they were defective.

24.    Fremont has suffered losses, including repair and replacement costs, and diminished value, as a direct and proximate result of (i) having purchased the defective fields, (ii) FieldTurf's concealment of the defect, and (iii) FieldTurf's failure to perform under its warranty.

## COMMON FACTUAL ALLEGATIONS

### Overview of FieldTurf's Unlawful Scheme

25.    This case centers on FieldTurf's design, manufacturing, marketing, sale, and, in some cases, installation, of certain defective monofilament synthetic grass turf systems ("Monofilament Surfaces").  All of the identifiable Monofilament Surfaces sold by FieldTurf are defective in various ways which combine to cause the fields to fail prematurely.

26.    Fremont, and many other municipalities, schools, school districts, boards of education, colleges, universities, and public and private entities across the United States, have invested millions of taxpayer dollars in FieldTurf's Monofilament Surfaces.  They did so on the understanding that the fields would be manufactured and installed as described.

27.    During the period that FieldTurf increased its efforts to market and sell its artificial fields, public funding was at an all-time low.  The Great Recession had caused municipalities to lay off employees and school districts to slash programs.  FieldTurf induced purchases by municipalities and school districts across the country with the promise of a long-lasting, low-maintenance athletic field that, as compared to natural grass or FieldTurf's artificial turf competitors, would provide long-term cost-savings.  Plaintiff and class members, however, received fields that are neither durable nor long-

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

lasting, but which cost hundreds of thousands of dollars to replace or repair.

**Composition, Pricing, and Marketing of FieldTurf's Artificial Turf Fields**

28.    FieldTurf designs, manufactures, markets, and sells artificial turf fields for use in football, baseball, soccer, tennis, and other athletic activities.  Artificial turf fields have lower maintenance costs than natural grass fields.  These turf fields are designed for year-round use in any weather condition with no downtime required for watering or fertilizing, or for recovery in between sporting events or practices.

29.    FieldTurf has sold its artificial turf products to municipalities, school districts, and others internationally and in the United States since 1994, when FieldTurf installed its first full-size soccer field.  FieldTurf has sold more than 7,000 fields, representing billions of dollars in revenue.

30.    Even though installation of Monofilament Surfaces entails high up-front costs, FieldTurf advises potential customers that installing such a surface is the best value in the market.

31.    FieldTurf's fields are made up of artificial fibers; a fabric backing to which these fiber blades are affixed; and a mixture of sand and rubber known as infill.  The bottommost layer of the turf is a base and drainage layer that provides for a level surface to allow precipitation to flow through before reaching a drainage system.  The fiber blades, which come in either a slit-film or monofilament structure, provide the turf with a natural grass appearance.  The fiber blades, moreover, are an important component of the turf's durability.  In a monofilament surface, such as the Irvington Ballfield that Fremont purchased, the fibers are commonly made from polyethylene resin, master batch (colorant), and a compound of UV stabilizers.  The latter allow the fibers to maintain their coloration and structure after extended exposure to UV radiation.  The final layer is the infill, which resembles topsoil in natural grass.  The infill is disbursed among the fibers as a filler, and has a direct impact on a turf's durability, playability, and safety.

32.    Although the monofilament fields cost FieldTurf less than the older slit-film versions of turf fields, FieldTurf charges a premium for its Monofilament Surfaces.  The average price for a FieldTurf Monofilament Surface is between $300,000 and $500,000.  Some customers have paid FieldTurf more than $1 million for Monofilament Surfaces.  FieldTurf justifies this high cost by promising that its product is more durable, with a significantly longer usable life, than the competition.

33.     Since 2005, FieldTurf has marketed its Monofilament Surfaces, including to Fremont, as having a lifespan of at least 10 years.  FieldTurf has made other representations in mailers and other advertising materials similarly touting the quality and durability of its artificial fields, such as:

- "FieldTurf's new 'DuraSpine monofilament fiber offers increased product life."
- "The fact remains that the new FieldTurf system will last longer."
- "The new monofilament, regardless of initial price, is a better value."
- "DuraSpine fiber is far more resistant to UV and foot traffic."
- "This spine gives each fiber unmatched 'memory' and thus resistance to matting."
- "Tests indicate the DuraSpine fiber is far more resistant to UV and foot traffic, the two main enemies of any turf system."
- "Making the wrong turf decision can cost you millions of dollars."

34.     The promised prolonged product life would allegedly deliver large savings over time. This was a critical selling point, because FieldTurf's Monofilament Surfaces were the most expensive on the market.  According to former FieldTurf Executive Kenny Gilman, customers paid at least a dollar per square foot premium for FieldTurf's Monofilament Surfaces, as compared to the competition.

35.     In addition to promising a ten-year product life, FieldTurf extended an eight-year manufacturer warranty on its Monofilament Surfaces.  FieldTurf claims that this insured warranty affords customers superior protection.  FieldTurf issued press releases stating that its customers would be "financially protected from catastrophic product failures," as "[e]veryone gets a warm security blanket from Chubb Insurance."

36.     During the same period, however, FieldTurf has been aware that its fields are defective, and, as a result, would begin to fail within a few years of installation.  In spite of this knowledge FieldTurf never disclosed to its customers, including Fremont, that its fields were defective.

**The Defective Turf Fields**

37.     FieldTurf acquired its monofilament fiber blades, which give the appearance of natural grass, from TenCate Thiolon Middle East, LLC ("TenCate"), formerly Mattex Leisure Industries ("Mattex").  TenCate manufacturers the fibers in the United Arab Emirates, and markets the turf

composed of the fibers under the brand name DuraSpine.

38.    These monofilament fibers were manufactured with an inferior resin and without proper UV stabilization, leading to premature degradation and failure.

39.    Between 2005 and 2012, FieldTurf sold over 1,400 Monofilament Surfaces with defective fibers under various brand names, including "FieldTurf," "Duraspine," "Duraspine Pro," "Prestige," "Evolution," "Tarkett," and "FieldTurf Tarkett."

40.    Long before the eight-year warranty or 10-plus-year guarantee expired, an alarming number of FieldTurf Monofilament Surfaces showed signs of significant premature deterioration. Between 2009 and 2010, more than 100 FieldTurf customers reported that their athletic fields failed to deliver the promised results.  The complaints were consistent—fibers were splitting, shredding, thinning, and fading during routine use, and large portions of the fields had experienced dramatic color degradation.

41.    In response to certain customer complaints, FieldTurf and TenCate representatives conducted field investigations to determine the cause of the problem.  FieldTurf and TenCate learned that regardless of environmental conditions, the Monofilament Surfaces displayed the same common premature physical and chemical degradation.  By 2014, more than 250 Monofilament Surfaces had prematurely deteriorated.

42.    In response to many of these complaints, FieldTurf informed the customers that the problem with their Monofilament Surfaces was simply "normal wear and tear"—which is not covered under the FieldTurf warranty.  Even so, the mounting complaints about the Monofilament Surfaces forced FieldTurf to take action.

### FieldTurf's Suit Against Its Supplier

43.    Faced with threats of litigation from various of its customers, FieldTurf sued TenCate in 2011, bringing claims for fraudulent inducement of contract and breach of warranties, and seeking injunctive relief (the "TenCate Litigation").  FieldTurf's complaint alleged that sometime after 2005, and after FieldTurf and TenCate entered into a supply agreement, TenCate altered the fiber formula by replacing quality ingredients with cheaper alternatives, making the fiber "less durable" and causing "premature disintegration during the warranty period."

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

44.    According to FieldTurf's chemistry expert, Dr. Charles Daniels, Monofilament Surfaces fail because the fibers are defective.  After analyzing hundreds of field inspection reports, and testing preserved and degraded fibers, Daniels concluded the fibers were manufactured with a low quality Lower Linear Density Polyethylene ("LLDPE"), contained insufficient levels of UV stabilizers, and had other "inherent weaknesses" (the "Daniels Report").  Daniels reported that these factors increased the risk of premature failure, stating that it was only a matter of time before the other Monofilament Surfaces failed.

45.    LLDPEs generally consist of "comonomers," which may include ethylene and different catalysts.  Typical comonomers are butene ("C-4 LLDPE") and octene ("C-8 LLDPE").  C-8 LLDPE is considered far superior to C-4 LLDPE because it provides more stability and increased tensile strength.  By way of example, a typical store-brand garbage bag made with C-4 LLDPE would rip easily if filled with too much garbage, whereas brand-name garbage bags made with C-8 LLDPE can withstand being stuffed with pizza boxes and heavy waste.  FieldTurf argued in the TenCate Litigation that the early samples of fibers FieldTurf received from Mattex (TenCate's predecessor) were C-8 LLDPE, but the fibers it received after the 2005 Supply Agreement were primarily C-4 LLDPE.

46.    According to the Daniels Report, LLDPEs are subject to chemical exposure from environmental conditions such as light, heat, and moisture, unless properly protected by certain additives.  Thus, UV stabilizers known as Hindered Amine Light Stabilizers ("HALS") are incorporated into the fiber during manufacturing to protect LLDPEs from UV radiation.  Daniels did not find the presence of HALS in degraded fibers.  The lack of sufficient HALS levels diminished the protection of the fibers from UV radiation.

47.    The Daniels Report also examined the basic structure of the fibers. Typically, fibers consist of a "spine" with two "wings" connected to the spine.  Daniels found that the wings were much thinner than the spine, which accelerated the rate of fiber breakdown because the wings were easily penetrated by UV light and oxygen.  This led to a "dramatic loss" in the tensile strength of fibers.

48.    FieldTurf's expert Daniels concluded that inferior LLDPEs, lack of sufficient HALS, and weak fiber structure, were uniform defects in all degraded fibers.

49.    Also in the TenCate Litigation, FieldTurf prepared a spreadsheet of the defective

8

Monofilament Surfaces that it claimed caused FieldTurf damages.  Court records establish that the FieldTurf spreadsheet shows every shipment of fibers that FieldTurf received from Mattex and TenCate.  FieldTurf admitted in the litigation that the defect in the monofilament fiber was universal to all Monofilament Surfaces containing those fibers.  It further admitted that the failure of Monofilament Surfaces was not related to the use or maintenance of the fields, and that FieldTurf was aware of premature degradation of Monofilament Surfaces in all of North America.

50.     FieldTurf claimed over $50 million in damages caused by the defective fibers. Categories of damages included completed, ongoing, scheduled, and future field replacements and repairs, as well as retention of an inventory of defective fibers that had "no future value."  These are some of the same fibers that are in the artificial turf fields Fremont and other customers purchased.

51.     At trial, FieldTurf and TenCate engaged in extensive direct and cross-examination of witnesses, including FieldTurf CEO Eric Daliere.  TenCate attempted to deflect responsibility by soliciting testimony from FieldTurf employees that demonstrated FieldTurf was aware of significant problems with the defective fibers far earlier than FieldTurf portrayed, yet continued to order the fibers.

52.     The parties to the TenCate litigation reached a settlement prior to verdict.

**FieldTurf's Knowledge of the Defect and of the Falsity of Its Marketing**

53.     In 2004, FieldTurf's initial testing results of its fibers were promising, but by February 2005 subsequent testing showed a drastic decrease in the durability of the fibers and "mediocre" UV resistance.  In May 2005, before entering into its first supply agreement with TenCate (formerly Mattex), FieldTurf had further reason to know that the "unmatched durability" it would later promise customers was misleading.  Bonar Yarns, another fiber supplier for FieldTurf, claimed that its test results of the monofilament fibers showed the product could not withstand normal wear and tear.  In an email to FieldTurf's then-CEO John Gilman, Bonar Yarns questioned FieldTurf's "over exuberance" in embracing the fibers.  Gilman wrote that FieldTurf knew "what's good and bad with the product" because the company had "tested it thoroughly."

54.     One of the earliest complaints about premature degradation of the monofilament fibers came in December 2005, when FieldTurf received an email from Pascal Harel, of Tarkett Sports,

reporting that the monofilament fiber was causing problems with a field installed in Le Plessis Robinson, near Paris, France.  That field had been installed for only seven months before the fiber "lost its resiliency and laid down."  Harel informed FieldTurf this "phenomenon" was "directly linked" to the fiber.

55.     Less than a year later, FieldTurf received notice of concerns over a newly installed Monofilament Surface in a South American country.  In October 2006, Laura Braga, FieldTurf's operations director for FieldTurf Latin America, emailed John Gilman that an artificial turf field installed in 2003 containing the old slit-film fiber was in better condition than the Monofilament Surface installed within the past year—which was displaying significant "premature wear."

56.     FieldTurf nonetheless continued to distribute marketing materials representing that its Monofilament Surfaces were the product of "engineering excellence" and "rigorous quality control," and that the Monofilament Surfaces were "the most durable and longest-lasting synthetic turf system in the marketplace."

57.     Troy Squires, FieldTurf's Vice President of Sales and Marketing from 2004 to 2009, stated that within a few years after starting to sell the Monofilament Surfaces, FieldTurf had earned very high profit margins, with sales doubling.

58.     Kevin Reynolds, FieldTurf's Vice President of Operations from 2000 to 2008, noted that the artificial turf industry is historically competitive with "[p]eople that like to push the envelope in terms of reality and truth."  Kenny Gilman, a FieldTurf executive, testified in 2014 that FieldTurf experienced "a constant problem of our sales and marketing people overpromising certain aspects of the FieldTurf system."

59.     On December 28, 2006, suspecting problems with the chemical makeup of the monofilament fiber, John Gilman complained to Jeroen Van Balen, then managing director of Mattex, that FieldTurf was "seeing fields showing splitting after under a year of play and have already had to replace one full-size field due to yarn failure after only a few months of installation!"  A draft letter from John Gilman to Van Balen, dated December 27, 2006, further details FieldTurf's concerns:

> We have a fiduciary responsibility to be aware of any future claims.
> Should we expect to replace more of these first version Evolution fields?
> The cost to replace a field is approximately $3.00/sqf USD plus the

removal and dumping costs. With over 700+ fields in the ground already with Evolution, and if a fifth of these fields already installed failed, the possible claim could be upwards of $35 million to replace them! Is the current pricing structure putting any reserve in place for this possibility?

There are currently a number of fields installed in Europe and the US that are starting to show wear and yarn splitting after less than a year in the ground, we need to have some assurance from Mattex that there is a plan and sufficient reserve in place to address any future claims for at least the next 24 months.

Days later John Gilman informed Van Balen that "we [FieldTurf] know with heavy use, the fiber is coming [sic] part" and there were already "a few failures" of FieldTurf's Monofilament Surfaces. Thus, according to Kenny Gilman, it was "clear" to FieldTurf by late 2006 that the monofilament fiber "wasn't performing in accordance with our earlier expectations."

60.    FieldTurf, however, kept secret from its customers who purchased Monofilament Surfaces in 2006 that the product was experiencing premature degradation. That year, FieldTurf sold at least 168 Monofilament Surfaces with the defective fibers.

61.    Kenny Gilman explained, in an extensive email to FieldTurf's then-CEO David Moszkowski and to New Jersey sales representative Perry Dipiazza, that Monofilament Surfaces installed in 2005 and 2006 were already becoming matted. Recognizing that by years five and six the fields would be significantly matted down, Gilman advised that FieldTurf's "marketing claims and sales pitches need to reflect this reality." This email would prove to be a source of conflict within FieldTurf. One in-house attorney informed Gilman that the information discussed would be damaging in a potential lawsuit. This led Gilman to email an IT specialist, inquiring whether the email could be wiped clean. The IT specialist informed Gilman that that would be a crime.

62.    By November 2007, FieldTurf plainly knew that its marketing of the Monofilament Surfaces was misleading, deceptive, and unfair. As shown in the email pictured below, high level executives at FieldTurf were aware that changes needed to be made.

11

CLASS ACTION COMPLAINT
CASE NO. 4:17-cv-5053

| | |
|---|---|
| **From:** | Kenny Gilman <kgilman@fieldturf.com> |
| **Sent:** | Friday, November 9, 2007 10:03 AM |
| **To:** | Kevin Reynolds <Kevin.Reynolds@fieldturftarkett.com>; David Moszkowski <David.Moszkowski@fieldturftarkett.com> |
| **Subject:** | Directives from legal department to salespeople and marketing department |

David / Kevin,

As you know our sales and marketing guys continually make claims that we can't possibly meet in the real world. This opens us up to tons of exposure from a legal standpoint. For example drainage claims by our salespeople currently have blown up in our face and there's pending lawsuits and 100's of thousands in holdbacks outstanding due to the fact that the fields can't possibly drain as fast as the sales guy's claim they will. On the marketing side the claims made regarding the Duraspine and Hard / Soft fiber are ridiculous. Everyday we are putting stuff out there that can't and won't live up to the marketing spin. We have to control this somehow!!!

Thanks
Kenny

CONFIDENTIAL                                                    GILMAN-TEN000102

Nonetheless, FieldTurf continued to make enhanced profits and increased market share a priority. In 2007, FieldTurf sold 317 defective Monofilament Surfaces in the United States.

63.    In 2008, Kenny Gilman wrote in a company document that "[i]rresponsible sales and marketing claims are made continuously that product simply cannot possibly technically deliver on." Gilman would later testify that Monofilament Surface failures were "consuming" FieldTurf. Even TenCate was aware of FieldTurf's internal struggle over the false marketing of Monofilament Surfaces. In an early 2008 email, TenCate executives noted "a lively discussion between FieldTurf [about] whether their marketing message had created unrealistic expectations." In June 2008, FieldTurf submitted its first warranty claim to TenCate for a defective Monofilament Surface—and during this same time, Monofilament Surface sales peaked, with FieldTurf selling 419 fields.

64.    In 2009 and 2010, in connection with FieldTurf's lawsuit against TenCate, customer complaints about their Monofilament Surfaces skyrocketed. At the time FieldTurf filed its complaint in the TenCate Litigation, it was currently installing 41 of the defective Monofilament Surfaces. Despite this massive failure, FieldTurf continued to sell the defective Monofilament Surface until the product was discontinued, in 2012.

65.    FieldTurf was on notice that its marketing campaign was misleading from the start. Darren Gill, Vice President of Marketing, Innovation and Customer Service, admitted in the TenCate

12

Litigation that FieldTurf never changed its marketing materials for the defective Monofilament Surfaces. Daliere, the CEO, conceded that FieldTurf never warned customers that they were purchasing a defective product.

66.    Rather than address the controversy head on, FieldTurf developed a product called "FiberGuard," to gain even more revenue and attempt to defer turf problems outside of the warranty period.

67.    FieldTurf also was aware of defects in the Monofilament Surfaces beyond the problems with the fiber. The Monofilament Surfaces were constructed using a gluing technique known as "finger coating" that saves FieldTurf substantial expense in constructing the fields, but which FieldTurf has known since December 2004 leads to premature degradation and "tuft bind." A tuft bind occurs when the tufts of the synthetic blades do not remain glued into the backing, and are easily pulled out, leading to a failure of the artificial turf system. John Rodgers, who was FieldTurf's Senior Research and Development Project Manager, admitted under oath that FieldTurf had a practice until at least 2010 of rigging passing scores for "tuft bind pull force" by "throwing out" the five lowest of twenty test pulls. Mr. Rodgers stated that, "[w]hen one picks and chooses data, any theory can be proved, sometimes with a catastrophic result."

68.    Further, the Monofilament Surfaces use tufts of only 6 fiber blades, contrary to FieldTurf's representations, in some cases, that the tufts would include 8 blades. Using fewer fiber blades in a tuft saved FieldTurf money, but made the Monofilament Surfaces even less durable and more prone to failure.

69.    In addition, despite representing that FieldTurf fields are constructed with 10 pounds of infill per square feet, FieldTurf delivered to its Monofilament Surface customers only approximately 8 pounds of infill per square foot. FieldTurf has admitted that it issued mandates for each Monofilament Surface that called for only approximately 8 pounds of infill, and purchases were delivered with only enough infill to account for approximately 8 pounds of infill per square foot. Multiplied over the approximately 80,000 square feet of the average Monofilament Surface, the result of FieldTurf's reduction in infill material is that purchasers received thousands of pounds less infill than they paid for, and were led to believe they would receive. Shorting customers the promised infill likely saved

FieldTurf thousands of dollars per field, while contributing to the premature degradation and failed attenuation of the Monofilament Surface.

70.      In another cost-saving measure, FieldTurf reduced the weight of the fiber used in the Monofilament Surfaces.  The fields with the defective monofilament fiber were produced with a DTEX (weight) of 1500.  A 2005 email correspondence among FieldTurf's then-CEO John Gilman and other FieldTurf employees, however, discusses the fact that, in wear trials of nine-stranded tufts— which FieldTurf would later reduce to six strands—tufts with a DTEX of 1500 had 80% deterioration, while DTEX of 1900 had only 40% deterioration.  Even though FieldTurf was aware in December 2005 that a lower DTEX would cause the product to experience significantly more deterioration, FieldTurf sold hundreds of Monofilament Surfaces with a reduced DTEX.

**The Harmful Consequences of FieldTurf's Violations**

71.      Customers of FieldTurf, such as municipalities, schools, school districts, boards of education, colleges, universities, and other public and private entities across the United States have fallen victim to FieldTurf's deceptive and unfair business practices.  FieldTurf sold Monofilament Surfaces that it claimed in the TenCate litigation are defective, and, when customers complained about problems, were told by FieldTurf that this was normal wear and tear.

72.      Moreover, when FieldTurf does replace a field "at no cost" under the warranty, it gives the customer a new field with more of the defective monofilament fibers.  In deposition testimony in the TenCate Litigation, Daliere conceded that FieldTurf continued to sell Monofilament Surfaces with the defective fiber and used the same defective material when handling warranty claims.

73.      For those FieldTurf customers who decline another defective Monofilament Surface, FieldTurf offers to replace the defective Monofilament Surface with an "upgrade," for an additional charge.  By paying hundreds of thousands more dollars to FieldTurf to "upgrade," customers can receive a new Monofilament Surface, which remains defective due to the lower amounts of infill and fewer number of fiber blades per tuft.

74.      All of FieldTurf's customers who have received Monofilament Surfaces have been damaged.  The class members did not receive the benefit of their bargain, for which they paid hundreds of thousands of (often taxpayer) dollars.  Instead of receiving a nondefective artificial turf

field, they received a field substantially certain to fail from premature deterioration and degradation, and worth substantially less than the field's purchase price.

75.    Plaintiff and class members also have expended thousands of additional dollars in increased maintenance costs, repair costs, and replacement costs.

## **CLASS ALLEGATIONS**

76.    Plaintiff brings this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.  Plaintiff seeks to represent the following class:

> All recipients of a defective Monofilament Surface from FieldTurf or its affiliates, entities, or subsidiaries in the United States, whose claim is within the applicable statute of limitations.

Within the class is the California subclass, defined to include:

> All recipients of a defective Monofilament Surface from FieldTurf or its affiliates, entities, or subsidiaries in the state of California, whose claim is within the applicable statute of limitations.

77.    Excluded from the class and California subclass are Defendants, any entity in which Defendants have a controlling interest, any of the officers, directors, or employees of the Defendants, the legal representatives, heirs, successors, and assigns of Defendants, anyone employed with Plaintiff's counsel's firms, and any Judge to whom this case is assigned, and his or her immediate family.

78.    The proposed class satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Federal Rule of Civil Procedure 23.  Certification of the class is appropriate under Rule 23(a) and Rule 23(b)(1), (b)(2), (b)(3), and/or (c)(4).

79.    The proposed class is so numerous that joinder of all members would be impracticable. Defendants sold defective Monofilament Surfaces to more than 1,000 customers nationwide. The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by FieldTurf.  The precise number of class members for the class is at least in the hundreds and most likely thousands, and thus the numerosity standard is

satisfied.  Because class members are geographically dispersed across the country, joinder of all class members in a single action is impracticable.

80.     There are questions of law and fact that are common to the claims of Plaintiff and the class, including, without limitation:

a.     Whether FieldTurf's Monofilament Surfaces are defective under normal use and fail within their expected useful lifespan;

b.     Whether FieldTurf had knowledge of the defects in the Monofilament Surfaces;

c.     Whether FieldTurf had a duty to disclose material facts to the class about the defects in the Monofilament Surfaces;

d.     Whether FieldTurf's omissions regarding the defective Monofilament Surfaces were likely to deceive the class; and

e.     Whether Plaintiff and the class members are entitled to damages, restitution, rescission, equitable relief, or other relief.

81.     The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein.

82.     Plaintiff's claims are typical of those of the class members it seeks to represent based on Defendants' common course of conduct and marketing and sale of uniformly defective products.  As a result of Defendants' unlawful conduct, each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff.

83.     Plaintiff is an adequate representative of the class it seeks to represent and will fairly and adequately protect the interests of class members.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent it.

84.     Maintenance of this action as a class action is a fair and efficient method for adjudicating this controversy.  It would be impracticable and undesirable for each member of the class to bring a separate action.  In addition, the maintenance of separate actions would place a substantial

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

85. Class certification is also appropriate under Rule 23(b)(1), 23(b)(2), and 23(c)(4) because:

a. The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

c. Defendants acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the members of the class as a whole; and

d. The claims of class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## **TOLLING OF THE STATUTES OF LIMITATIONS**

86. Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and class members could not have reasonably discovered the true nature of the defect until shortly before this class action litigation was commenced. Defendants were and remain under a continuing duty to disclose to Plaintiff and class members the true character, quality, and nature of the defect. As a result of Defendants' active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**FIRST CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against Defendants)**
**(On behalf of the Class)**

87. Plaintiff re-alleges and incorporates the preceding paragraphs.

17

CLASS ACTION COMPLAINT
CASE NO. 4:17-cv-5053

88.    Plaintiff and class members have conferred a benefit on FieldTurf, including by purchasing defective Monofilament Surfaces.  Since 2005, FieldTurf has received benefits from class members in the form of more than $570 million in revenue through the sale of nearly 1,500 defective Monofilament Surfaces with defective monofilament fiber.

89.    FieldTurf manufactured, marketed, sold, constructed, and installed defective Monofilament Surfaces, and touts a 10-plus year field lifespan, despite knowing that the turf would prematurely deteriorate within a few years of installation. The reduced lifespan of FieldTurf's artificial turf systems has unjustly enriched FieldTurf, which gained profits and revenues through deception and omission.

90.    By its conduct detailed above, FieldTurf acted unconscionably toward and wrongfully obtained funds from Plaintiff and class members.  FieldTurf acted with conscious disregard for the rights and interests of Plaintiff and class members.

91.    It is inequitable for FieldTurf to retain the financial benefits it received, and may still be receiving, from Plaintiff and class members in connection with the defective Monofilament Surfaces. FieldTurf's retention of such funds constitutes unjust enrichment.

92.    FieldTurf's ill-gotten gains rightfully belong to Plaintiff and class members.  FieldTurf should be ordered to make restitution or to disgorge funds in the amounts by which it has been unjustly enriched at Plaintiff's and class members' expense.

**SECOND CLAIM FOR RELIEF**
**Violations of the Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(Against Defendants)**
**(On behalf of the California Subclass)**

93.    Plaintiff re-alleges and incorporates the preceding paragraphs.

94.    The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice[.]"

95.    Defendants' acts, omission, and practices are unlawful because they breached the express warranty, the implied covenant of good faith and fair dealing, and the implied warranties associated with the purchase and installment of Monofilament Surfaces.

96.    Defendants' conduct is unfair because it violates California's legislatively declared policy prohibiting breaches of express and implied warranties, as discussed below.  Defendants acted

18

**CLASS ACTION COMPLAINT**
CASE NO.  4:17-cv-5053

1    unscrupulously in a manner that is substantially injurious to consumers.  Among other violations,

2    Defendants:

3            a.    marketed and sold Monofilament Surfaces with actual or constructive knowledge

4    of the fields' propensity to fail because of defective monofilament fibers, low amounts of infill, and

5    other known deficiencies;

6            b.    marketed and sold Monofilament Surfaces containing defects that caused their

7    premature failure;

8            c.    replaced defective Monofilament Surfaces with defective Monofilament

9    Surfaces; and

10            d.    refused to repair or replace defective Monofilament Surfaces that failed.

11        97.    Defendants' acts and practices are contrary to California law and policy and constitute

12    unreasonable and oppressive business practices that caused substantial injury to Plaintiff and

13    California subclass members.

14        98.    The gravity of the harm resulting from Defendants' conduct outweighs any potential

15    utility. There are reasonably available alternatives that would further Defendants' legitimate business

16    interests, such as replacing defective Monofilament Surfaces with non-defective Monofilament

17    Surfaces, or informing consumers prior to their purchase of a field of its susceptibility to premature

18    failure.

19        99.    Plaintiff and California Subclass members could not have reasonably avoided injury

20    from Defendants' unfair and unscrupulous trade practices.  Plaintiff and California Subclass members

21    did not know, and had no reasonable means of discovering that the Monofilament Surfaces were

22    defective or that Defendants would refuse to replace defective Monofilament Surfaces with non-

23    defective Monofilament Surfaces.

24        100.    All of Defendants' unlawful and unfair conduct occurred in the course of Defendants'

25    business and was part of a generalized course of conduct.

26        101.    As a direct and proximate result of Defendants' conduct, Plaintiff and California

27    Subclass members have suffered injuries, including by overpaying for their defective Monofilament

28    Surfaces and being deprived of use of their fields that failed prematurely.

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

102.    Plaintiff and California Subclass members accordingly are entitled to appropriate relief, including restitution, declaratory relief, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from engaging in the above practices violative of the UCL.

### THIRD CLAIM FOR RELIEF
**Breach of Express Warranty**
**(Against Defendants)**
**(On Behalf of the Class)**

103.    Plaintiff re-alleges and incorporates the preceding paragraphs.

104.    FieldTurf sold and installed Monofilament Surfaces to Plaintiff and class members.

105.    FieldTurf expressly warranted to Plaintiff and the class that, in purchasing FieldTurf's Monofilament Surfaces, they would be receiving a high-quality field that would not suffer from premature deterioration and would be usable for at least ten years.

106.    FieldTurf's written warranty covers defects in materials and workmanship of the turf for a period of eight years from the date of completion.  FieldTurf expressly warranted to Plaintiff and the class that it would repair or replace at no cost Monofilament Surfaces that experienced premature deterioration within the eight-year written warranty period.

107.    FieldTurf breached the express warranties that accompanied the sale of the Monofilament Surfaces.  FieldTurf knew that the Monofilament Surfaces were not of high quality, would prematurely deteriorate, were not durable enough to be usable for the promised durations, and were otherwise defective.  Plaintiff and class members' Monofilament Surfaces experienced premature deterioration before the expiration of the eight-year written warranty period and before the ten-plus years of functionality that FieldTurf separately promised.

108.    FieldTurf received timely notice of the breaches experienced by Plaintiff and class members.

109.    FieldTurf failed to repair or replace failing fields and did not provide the promised remedies.  FieldTurf repeatedly and falsely denied that failing fields were failing, stalled the handling and/or submission of warranty claims until the warranty expired, and offered class members repairs or replacements only at substantial further cost.

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

110. Plaintiff and class members used and maintained their fields in a manner consistent with the recommended use and maintenance guidelines for their Monofilament Surfaces, and performed their duties under the terms of FieldTurf's express warranties.

111. As a direct and proximate result of FieldTurf's breaches of express warranty, Plaintiff and class members have been damaged in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against Defendants)**
**(On Behalf of the Class)**

112. Plaintiff re-alleges and incorporates the preceding paragraphs.

113. Plaintiff and class members entered into agreements with FieldTurf for the purchase of Monofilament Surfaces.

114. FieldTurf breached the covenant of good faith and fair dealing that inheres in Plaintiff and class members' contracts for Monofilament Surfaces.

115. A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance. The duty to act in good faith and deal fairly requires adherence to commercial norms and prevents a contracting party from acting in contravention of the counterparty's objectively reasonable expectations arising from the agreement.

116. FieldTurf breached the covenant of good faith and fair dealing in its Monofilament Surface contracts, including by:

a. concealing that its Monofilament Surfaces were defective and would prematurely deteriorate well before the promised lifespan of at least ten years;

b. concealing that its Monofilament Surfaces would be installed with eight, rather than ten, pounds of infill;

c. refusing to repair defective Monofilament Surfaces or to replace them with non-defective fields; and

d.      offering to replace or repair defective fields only at a substantial cost to Plaintiff and class members.

117.   The quality of Monofilament Surfaces fell materially below the ordinary commercial standards for such products.  Plaintiff's and class members' receipt of Monofilament Surfaces that were certain to fail prematurely violated their objectively reasonable expectations connected with their purchase orders from FieldTurf.

118.   As a direct and proximate result of FieldTurf's breach of the implied covenant of good faith and fair dealing, Plaintiff and class members have sustained damages in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**Breach of the Implied Warranty of Merchantability**
**(Against Defendants)**
**(On Behalf of the Class)**

119.   Plaintiff re-alleges and incorporates the preceding paragraphs.

120.   By operation of law, Defendants impliedly warranted to Plaintiff and class members that the Monofilament Surfaces they purchased were of merchantable quality and fit for their ordinary and intended purposes.

121.   Plaintiff and class members either directly purchased the Monofilament Surfaces from Defendants, or are the intended third-party beneficiaries of written agreements between Defendants and of the implied warranties attached to those contracts.

122.   Defendants were at all relevant times merchants with respect to Monofilament surfaces.

123.   Defendants breached the implied warranty of merchantability in connection with their sale and installation of the Monofilament Surfaces.  At the point of sale and at installment, the fields contained manufacturing and installation defects whose manifestation prematurely deteriorated the fields and caused them to fail.  The Monofilament Surfaces sold by Defendants were unmerchantable and would not pass without objection in the artificial turf trade.

124.   The defects in the Monofilament Surfaces existed when the fields left Defendants' control, and rendered them unfit for their ordinary and intended purposes as artificial turf fields.

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

Among other things, the Monofilament Surfaces lack the quality and durability that FieldTurf represented and that Plaintiff and class members reasonably expected.

125.   Defendants had opportunities to cure their breach of warranties, but refused to replace defective fields with non-defective fields, or offered Plaintiff and class members repairs or replacements at substantial cost.

126.   As a direct and proximate result of Defendants breach of the implied warranty of merchantability, Plaintiff and class members have sustained damages in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**Breach of the Implied Warranty of Fitness for a Particular Purpose**
**(Against Defendants)**
**(On Behalf of the Class)**

127.   Plaintiff re-alleges and incorporates the preceding paragraphs.

128.   Defendants at all relevant times were sellers of Monofilament Surfaces.

129.   Defendants were aware that Plaintiff and class members relied on FieldTurf's skill and judgment in the sale, manufacture, and installation of Monofilament Surfaces that would be suitable for their particular purpose as athletic fields, and free from defects.

130.   Defendants' Monofilament Surfaces were not fit for the purpose for which they were to be used.  The Monofilament Surfaces did not have the quality or amount of materials, durability, or lifespan as promised by Defendants, and deteriorated prematurely, within a few years of installation.

131.   Defendants thus breached the implied warranty of fitness for a particular purpose.

132.   As a direct and proximate result of Defendants' breach of the implied warranty of fitness for a particular purpose, Plaintiff and class members have sustained damages in an amount to be determined at trial.

23

**CLASS ACTION COMPLAINT**
**CASE NO.  4:17-cv-5053**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and all similarly situated individuals, respectfully seeks judgment against Defendants in the form of an Order:

A.      Finding this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure and appointing Plaintiff and its counsel as representatives of the class;

B.      Finding that Defendants were unjustly enriched;

C.      Finding that Defendants breached their express warranties to Plaintiff and the class;

D.      Finding that Defendants breached their implied covenant of good faith and fair dealing to Plaintiff and the class;

E.      Finding that Defendants breached the implied warranty of merchantability connected with Plaintiff's and class members' purchases;

F.      Finding that Defendants breached the implied warranty of fitness for a particular purpose connected with Plaintiff's and class members' purchases;

G.      Awarding appropriate damages and/or equitable relief;

H.      Awarding pre- and post-judgment interest as prescribed by law;

I.      Awarding reasonable attorneys' fees and costs; and

J.      Entering such other relief the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Dated: August 30, 2017                              Respectfully submitted,


By:      /s/ *Adam E. Polk*

Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Angelica M. Ornelas (State Bar No. 285929)
**GIRARD GIBBS LLP**

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053

601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
*dcg@girardgibbs.com*
*je@girardgibbs.com*
*aep@girardgibbs.com*
*amo@girardgibbs.com*

*Attorneys for Plaintiff City of Fremont*

CLASS ACTION COMPLAINT
CASE NO.  4:17-cv-5053